| United States of America, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:17-cr-00418-1 |
| | § | |
| Yolanda Hamilton, M.D., | § | |
| | § | |
| *Defendant.* | § | |

## DEFENDANT YOLANDA HAMILTON, M.D.'S MOTION FOR REDUCTION IN SENTENCE

Samuel J. Louis
Texas Bar No. 12588040
samuel.louis@hklaw.com
HOLLAND & KNIGHT
1100 Louisiana, Suite 4300
Houston, Texas 77002
(713) 244-6860
(713) 821-7001 Fax

Marcy Hogan Greer
Attorney-in-Charge
State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

James Turner
State Bar No. 20316950
GREGOR WYNNE ARNEY PLLC
jturner@gwafirm.com
700 Louisiana, Suite 3950
Houston, Texas 77002
(832) 390-2644

ATTORNEYS FOR YOLANDA HAMILTON, M.D.

TABLE OF CONTENTS

Page

I.   The First Step Act and amended Sentencing Guidelines permit the requested relief. .................................................................................................... 5

II.  There are several "extraordinary and compelling" reasons to grant the requested sentence reduction. ............................................................. 10

     A.   Medical Circumstances ......................................................... 10

          1.   Elevated health risks due to infectious disease. .......................... 10

          2.   Inadequate long-term and specialized medical care. .................. 14

          3.   Substantially diminished ability to provide self-care. .................. 17

     B.   Family Circumstances ........................................................... 18

III. A reduction of sentence is consistent with the 18 U.S.C. § 3553(a) factors. ........ 19

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*LeBeau v. United States*,
No. 4:23-cv-4038, 2023 WL 7413658 (S.D.S.D. Nov. 9, 2023) .............................................13

*United States v. DiMasi*,
220 F. Supp. 3d 173 (D. Mass. 2016) .............................................................................20, 21

*United States v. Graham*,
No. 16 CR 786 (NSR) (02), 2023 WL 3222483 (S.D.N.Y. May 3, 2023) .............................17

**Statutes**

18 U.S.C. § 3553(a) .........................................................................................7, 12, 19, 21

18 U.S.C. § 3553(a)(1) ...........................................................................................................19

18 U.S.C. § 3553(a)(2) ...........................................................................................................19

18 U.S.C. § 3553(a)(2)(A) ......................................................................................................22

18 U.S.C. § 3553(a)(2)(B) ......................................................................................................22

18 U.S.C. § 3553(a)(2)(C) ......................................................................................................22

18 U.S.C. § 3553(a)(2)(D) ................................................................................................19, 20

18 U.S.C. § 3582(c)(1)(A) ............................................................................................. *passim*

28 U.S.C. § 994(t) ..................................................................................................................10

First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (Dec. 21, 2018)................................1

**Sentencing Guidelines**

USSG § 1B1.13................................................................................................................4, 9

USSG § 1B.13(b)(1)(B) .............................................................................................................9

USSG § 1B.13(b)(1)(C) .............................................................................................................9

USSG § 1B.13(b)(1)(D).........................................................................................................9, 10

USSG § 1B.13(b)(1)(D)(i) ................................................................................11

USSG § 1B.13(b)(1)(D)(ii) ...............................................................................12

USSG § 1B1.13(b)(1)(C) ..................................................................................14

USSG § 1B1.13(b)(3) .......................................................................................19

USSG § 1B1.13(b)(5) .......................................................................................19

USSG § 5H1.1 .................................................................................................23

USSG § 5H1.4 .................................................................................................23

**Other Authorities**

Casey N. Ferri, *A Stuck Safety Valve: The Inadequacy of Compassionate Release for Elderly Inmates*, 43 STETSON L. REV. 197, 219-25 (2013) .................................21

Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (May 11, 2023) ................................................................. 3, 12-13

Erica Zunkel, *18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner,"* 9 NOTRE DAME J. INT'L LAW 49, 61 (2019) ..............................................................................7, 20, 21

Gloria Way, *Former County HR Director Tocarra Green Passes Away*, SEABREEZE BEACON (Oct. 3, 2023) ...................................................... 16-17

Hannah Phillips, *Inexcusable: Attorney blasts federal prison officials over Boca woman's medical care*, THE PALM BEACH POST (Oct. 27, 2023) ...........................16

Kaley Johnson, *Women's prison in Fort Worth again 'full of COVID,' 2 die from virus at men's prison*, FORT WORTH STAR-TELEGRAM (Jan. 24, 2021) ...................11

Miltonette Oliver Craig, Mijin Kim, and Dawn Beichner-Thomas, *Incarcerated in a Pandemic; How COVID-19 Exacerbated the "Pains of Imprisonment*, 2023 GA. STATE CRIM. J. REV. 1 (July 27, 2023) ................................. 14, 18-19

Natalie Hinton, Comment, *Curing the BOP Plague with Booker: Addressing Inadequate Treatment in the Bureau of Prisons*, 41 J. MARSHALL L. REV. 219 (2007) ............................................................................................20

Walter Palvo, *Bureau of Prisons Sees End of Cares Act Home Confinement, Some Prisoners Will Be Left Behind*, FORBES (Mar. 14, 2023) ..........................8

Walter Palvo, *The Unnecessary Risk of Incarcerating Minimum Security Inmates*, FORBES (June 28, 2023). ...................................................................................................7, 8

U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013) .....................................................................................................................6

U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic* (Mar. 2023) .............................................7-8, 13, 21-22

U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017)...........................................................................................22

U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index* (Nov. 1, 2023) .............................6, 10

Victoria Law, *The Prison as Petri Dish*, HARVARD RADCLIFFE INST. NEWS & IDEAS (Mar. 11, 2022)................................................................................11, 12, 13

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b)(1) of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018), and as interpreted by the amended United States Sentencing Guidelines, Yolanda Hamilton, M.D. respectfully moves the Court for a reduction in sentence.

## PRELIMINARY STATEMENT

Before entering prison over a year ago, Dr. Hamilton informed the Court of some serious, debilitating health conditions: four herniated discs with associated neurological impacts, hypertension, and a dental condition requiring extensive endodontic treatment. She also provided the Court with prescribed treatment plans for each condition, and explained her concern that she would receive inadequate treatment at FMC Carswell.[1] Since her incarceration in Carswell in October 2022, Dr. Hamilton has not received appropriate medical care,[2] and as a result, her chronic medical conditions have worsened. In addition, because of black mold on the walls and asbestos in the carpets at Carswell, Dr. Hamilton has developed new respiratory conditions, including chronic obstructive pulmonary disease (COPD) and asthma, and has suffered from an infection that developed into pneumonia and was not adequately treated for months.[3]

In late April 2023, Carswell certified Dr. Hamilton for release to home confinement under the CARES Act. Both she and the Unit Manager signed the paperwork confirming that she met the conditions for CARES release: (1) she is at great risk of an adverse health outcome if she contracts infectious diseases, including COVID; (2) she has no history of violence (much less

---

[1] *E.g.*, Dkt. ##315, 316, 323, 324, 328, 331.

[2] *See generally* Exhibit 1 (filed contemporaneously under seal).

[3] *Id.* ¶¶ 24-26.

terrorism or sexual offenses), as well as a near-perfect disciplinary record;[4] and (3) she has a viable release plan.[5] All that remained was confirmation of her home conditions by the Probation Department and approval by the Central Office of the Bureau of Prisons ("BOP") because she had not yet served fifty percent of her sentence.[6]

A representative from the Probation Department for the Southern District of Texas spoke with Dr. Hamilton's mother on April 30 indicating that Dr. Hamilton would be released.[7] But unfortunately, the department inexplicably failed to send the report to Carswell until May 15, 2023, **after** the CARES Act authority expired. Despite Dr. Hamilton's persistent attempts to confirm the status of her paperwork with Carswell officials, no one told Dr. Hamilton that the transmission of the report was delayed until it was too late.[8]

This news was all the more crushing because Dr. Hamilton's physical health is continuing to deteriorate due to the conditions and lack of appropriate medical care at FMC Carswell, revealing that the promises made by the U.S. Government and BOP prior to her incarceration[9] were empty ones.

The Court may order "compassionate release" to secure Dr. Hamilton "medical care . . . in the most effective manner"—even **if** the BOP could and did offer good care. In Dr. Hamilton's case, the BOP has repeatedly failed to provide the care that she needs, and that the BOP promised

---

[4] *See* part III & Exhibit 1 ¶ 36 (discussing disciplinary action for a three-way phone call set up by Dr. Hamilton's cousin to resolve an issue with a creditor that was against prison policy unbeknownst to Dr. Hamilton and is on appeal).

[5] Exhibit 1-B.

[6] This is not a requirement under the amended Sentencing Guidelines.

[7] Exhibit 2 ¶ 8; *see also* Exhibit 3 ¶¶ 4-5.

[8] Exhibit 1 ¶¶ 8-9.

[9] Dkt. ##329 & 330.

her. As a result, her herniated cervical and lumbar discs are degenerating—threatening permanent impairment. Her hypertension has been exacerbated. And she now suffers from COPD and asthma—conditions that she developed a year ago[10]—but has yet to see a pulmonologist.[11] These now-exacerbated respiratory conditions leave her at a higher risk of developing quite serious adverse effects from COVID.[12]

Not only is Dr. Hamilton suffering physically, but she and her family are suffering emotionally as well. Dr. Hamilton's family desperately needs her back home. The circumstances of the family members living in Dr. Hamilton's home were disclosed to the Court in connection with her request to postpone her self-reporting date.[13] The situation there has been worsening as well, as detailed in declarations from Dr. Hamilton and her mother, Exhibits 1 and 2, filed contemporaneously under seal. Dr. Hamilton has suffered so much already, having lost her profession of 30 years and her stellar reputation, having become financially ruined, having watched her family suffer immensely, and now, having suffered permanent impairment of her health. And if not granted relief soon, she stands to lose so much more.

Having served 23% of her sentence thus far, and suffering from many factors that the Sentencing Guideline Commission and BOP recognize as relevant factors governing compassionate release, Dr. Hamilton respectfully requests that the Court grant compassionate relief in the form of a reduction of her sentence to time served or, in the alternative, imposition of

---

[10] *See* Exhibit 1 ¶ 26; *see also id.* Ex. 1-A at YLH00148.

[11] Exhibit 1 ¶ 26.

[12] Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (May 11, 2023), available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 11, 2023) (listing "Chronic lung diseases," including "Asthma, if it's moderate to severe" and "COPD").

[13] Dkt. ##306, 307, 313, 315, 316.

a term of probation with or without home confinement in order to allow her to go home where she can address her serious health issues and take care of her ailing family.

PROCEDURAL HISTORY AND PREREQUISITES

Dr. Hamilton was convicted of Medicare fraud and sentenced to 60 months in prison. She had no prior history of any unlawful behavior, and had dedicated her life to providing medical care and other community service to minorities and other disadvantaged individuals.

Dr. Hamilton reported to FMC Carswell on October 17, 2022, to serve her sentence. Now, over a year later, she is 60 years of age, her preexisting conditions are progressing, and she has developed additional comorbidities while incarcerated. Exhibit 1 ¶¶ 21, 23, 24-27, 31.

Dr. Hamilton applied for release under the CARES Act in March of this year. Exhibit 3-A. She was provided a "Summary Reentry Plan," through which the FMC Carswell Facility certified Dr. Hamilton for release to home confinement under the CARES Act. Exhibit 1-B. On April 29, 2023, both Dr. Hamilton and the Unit Manager signed the paperwork confirming that she met the conditions for CARES release—she (1) is at great risk of an adverse health outcome if she contracts infectious diseases, including COVID, (2) has no history of violence (much less terrorism or sexual offenses), (3) has a near-perfect disciplinary record,  and (4) has a viable release plan. *Id.* All that remained was for the Probation Department to confirm her home conditions and BOP Central to approve.[14] The plan was for her to be released in the summer of 2023. Unfortunately, although the Probation Department spoke with Dr. Hamilton's mother indicating the plan for her release around April 30, 2023, it inexplicably failed to send the report to Carswell until May 15, 2023, after the

---

[14] For purposes of the CARES Act, BOP used a criteria that the defendant had "served at least 50 percent of their sentence or had 18 months or less remaining on [her] sentence," but BOP Central could waive that requirement. *See* OIG Capstone Report at 33. Serving 50 percent of one's sentence is not a requirement under the amended Sentencing Guidelines. *See generally* USSG § 1B1.13.

CARES Act authority expired.[15] No one told Dr. Hamilton—despite her attempts to confirm with Carswell officials—until after it was too late. Exhibit 1 ¶¶ 8-9. She eventually was informed that her application could not be completed because the CARES Act had expired. Exhibit 1 ¶¶ 9-10; Exhibit 3-D.

On November 1, 2023—the day that the amended Sentencing Guidelines took effect—Dr. Hamilton requested Warden Smith to move, under 18 U.S.C. § 3582(c)(1)(A), for a reduction of her sentence to time served or, in the alternative, probation with or without home confinement. Exhibit 3-E. The request was delivered no later than November 9, 2023, Exhibit 3-F, and Warden Smith sent a letter to Dr. Hamilton denying the request on November 22, 2023, Exhibit 3-G. More than 30 days have passed since Warden Smith's receipt of Dr. Hamilton's request. Therefore, pursuant to the First Step Act, Dr. Hamilton now moves this Court directly for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).

**ARGUMENT AND AUTHORITIES**

**I.   The First Step Act and amended Sentencing Guidelines permit the requested relief.**

Section 3582(c)(1)(A) of Title 18 allows district courts to reduce federal prisoners' sentences for "extraordinary and compelling reasons"—often referred to as "compassionate release:"

(c) Modification of an imposed term of imprisonment. …

(1) in any case –

>    (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

---

[15] Dr. Hamilton has not been provided a copy of the home study report that she understands was conducted by the Probation Department for the Southern District of Texas, but the Court may have access to this document.

such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent they are applicable, if it finds that –

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

The statute first requires exhaustion of the administrative remedy with the BOP, but the BOP's history of requesting these releases has been "sparing" to say the least. United States Sentencing Commission, *Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index*, at 7 (Nov. 1, 2023) ("USSG Amendments") (Exhibit 4).[16] In fact, the Department of Justice's own Office of the Inspector General ("OIG") found, in 2013, that "the existing BOP compassionate release program is poorly managed and that its inconsistent and ad hoc implementation has likely resulted in potentially eligible inmates not being considered for release[, and] . . . terminally ill inmates dying before their requests for compassionate release were decided." U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013),[17] at 53. Although the Sentencing Commission has indicated that "extraordinary and compelling reasons" could be based on the defendant's medical conditions, family circumstances, age, and other factors,

---

[16] Exhibit 4 contains the portion of the Official Text relating to these amendments. The entire document can be found at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf (last visited Dec. 11, 2023).

[17] Available at the following URL: https://oig.justice.gov/reports/2013/e1306.pdf (last visited Dec. 11, 2023).

both the BOP and many courts have interpreted the phrase extremely narrowly. USSG Amendments at 7.

Dissatisfaction with the BOP's overly restrictive interpretation and administration of its compassionate-release program led Congress to pass reforms in the First Step Act. *See, e.g.*, Erica Zunkel, *18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner*," 9 NOTRE DAME J. INT'L LAW 49, 61 (2019) ("The First Step Act aims to increase 'the use and transparency of compassionate release' by broadening eligibility and removing sole discretion for determining who is eligible for compassionate release from the BOP." (footnote omitted)).

During the COVID-19 pandemic, Congress passed the CARES Act, which afforded BOP a way to reduce overcrowding of inmates in federal prisons by transferring minimum security prisoners with COVID-risk health conditions to home confinement. The program was a spectacular success. As a Forbes article reported, "Between March 26, 2020, and January 23, 2023, the BOP placed in home confinement a total of 52,561 inmates, mostly minimum security and some with many years to serve on their sentence. The program had a 99% success rate with most inmates successfully completing their sentences without an incident." Walter Palvo, *The Unnecessary Risk of Incarcerating Minimum Security Inmates*, FORBES (June 28, 2023).[18] The OIG confirmed a two-percent rate of recidivism with inmates released to home confinement under the CARES Act. *See* U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic*, at 32 (Mar. 2023) ("Capstone Report").[19] "The CARES Act demonstrated that a select

---

[18]   https://www.forbes.com/sites/walterpavlo/2023/06/28/the-unnecessary-risk-of-incarcerating-minimum-security-inmates/?sh=554421a95353 (last visited Dec. 11, 2023) (Exhibit 5).

[19] https://oig.justice.gov/sites/default/files/reports/23-054.pdf  (last visited Dec. 11, 2023).

group of prisoners could be identified and successfully placed in community settings for an extended portion of their sentence." Walter Palvo, *Bureau of Prisons Sees End of Cares Act Home Confinement, Some Prisoners Will Be Left Behind*, FORBES (Mar. 14, 2023).[20]

The OIG has encouraged the BOP to make more active use of this vehicle for transferring non-violent and ailing prisoners to home confinement, consistent with Congress's enactment of the CARES Act, and the Attorney General's implementation of it:

> [T]he BOP needs to assess how it can more effectively use its home confinement authorities. For example, the BOP did not fully utilize its authorities to help address inmate population issues at prisons with COVID-19 outbreaks and social distancing, quarantine, and staffing challenges. While the BOP transferred a substantial number of inmates from prisons to home confinement during the first few months of the pandemic, the BOP actually transferred fewer inmates during the first year of the pandemic than it had during the year immediately preceding the pandemic. … Of the inmates who were transferred to home confinement during the first year of the pandemic, less than 2 percent failed to comply with program rules.

OIG Capstone Report at ii.

In sum, the COVID-19 pandemic has substantiated home incarceration as a remarkably effective means to protect older and medically vulnerable inmates from disease while at the same time safeguarding society at large, reducing recidivism, and saving taxpayer money. *See* Palvo, *Unnecessary Risk*, at 3 ("In Fiscal Year (''FY'') … 2020, [the cost of incarceration fee for an inmate in a Federal facility] was $120.59 per day. By contrast, according to the BOP, an inmate in home confinement costs an average of $55.26 per day—less than half the cost of an inmate in secure custody."). Consequently, on November 1 of this year, the Sentencing Commission's amended Guidelines went into effect, effectively adopting the successful criteria used under the CARES Act as "extraordinary and compelling reasons" for reducing a term of imprisonment.

---

[20] https://www.forbes.com/sites/walterpavlo/2023/03/14/bureau-of-prisons-sees-end-of-cares-act-home-confinement-some-prisoners-will-be-left-behind/?sh=4829462151c0 (last visited Dec. 11, 2023) (Exhibit 6).

The Sentencing Commission expanded the Guidelines promulgated under 18 U.S.C. § 3582(c)(1)(A)—USSG § 1B1.13—to (1) add subcategories of "Medical Circumstances of the Defendant" warranting this relief, (2) modify the "Family Circumstances" provision, and (3) confirm that there is no restrictive list of what combination of factors can warrant release. USSG Amendments at 8-10.

"Medical Circumstances" that are now specifically deemed to constitute "extraordinary and compelling reasons" for release include three reasons to grant relief to Dr. Hamilton:

- The defendant is suffering from a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which … she is not expected to recover, USSG § 1B.13(b)(1)(B);

- The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death, USSG § 1B.13(b)(1)(C); and

- [T]he defendant is housed at a correctional facility affected or at imminent risk of being affected by an ongoing outbreak of infectious disease … [and] due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease … and such risk cannot be adequately mitigated in a timely manner, USSG § 1B.13(b)(1)(D).

The "Family Circumstances" ground has also been expanded to expressly consider the wellbeing of "a child who is 18 years of age or older and incapable of self-care because of a … mental or physical disability." *Id.* at 9.

In addition:

the amendment retains the 'Other Reasons' catch-all ground [formerly found in Application Note 1(D)] to … make[] clear that extraordinary and compelling reasons exist if the defendant presents any other circumstance or combination of circumstances that, considered by themselves or together with any of the reasons specified in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)."

9

*Id.* at 10. The Commission described these amendments as being necessary "to better account for and reflect the plain language of section 3582(c)(1)(A), its legislative history, and decisions by courts made in the absence of a binding policy statement." *Id.* at 8.

**II. There are several "extraordinary and compelling" reasons to grant the requested sentence reduction.**

Congress has delegated the authority to define "extraordinary and compelling reasons for sentence reduction" to the Sentencing Commission. *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The Commission provided such definitions and descriptions in the November 1 amendments. In addition, the Commission's amended Guidelines confirm the District Court's wide authority and discretion to grant the requested relief. *See* USSG Amendments at 10 ("[D]istrict courts around the country based sentence reductions on dozens of reasons and combinations of reasons. Based on a careful review of those cases, the Commission continues to believe … that judges are 'in a unique position to determine whether the circumstances warrant a reduction.'" (citing note 4 of its prior policy statement)).

**A. Medical Circumstances**

**1. Elevated health risks due to infectious disease.**

New § 1B.13(b)(1)(D) essentially codifies the CARES Act basis for compassionate release when a defendant: (1) is in custody in a facility "affected or at imminent risk of being affected" by "an ongoing outbreak of infectious disease" and (2) has personal health risk factors that put her "at increased risk of suffering severe medical complications or death as a result of exposure," and (3) the "risk cannot be adequately mitigated in a timely manner." USSG § 1B.13(b)(1)(D).

Dr. Hamilton meets each of the criteria. First, she is in custody at Carswell, which is "affected or at imminent risk of being affected by an ongoing outbreak of infectious disease," specifically COVID-19 and flu. USSG § 1B.13(b)(1)(D)(i); *see also* Exhibit 1 ¶ 28. During her incarceration, operations at Carswell have ranged between Level 1 and Level 3,[21] with multiple lockdowns and frequent quarantines of units or floors of the facility. *Id.* BOP reports that almost 900 inmates have tested positive for COVID,[22] and eight have died as a result of the heightened COVID exposure levels. https://www.bop.gov/coronavirus/covid19_statistics.html (last visited Dec. 11, 2023); *see cf.* "By mid-January [2022], Carswell reported 316 active COVID cases, the second highest number in the entire federal prison system…." Victoria Law, *The Prison as Petri Dish*, HARVARD RADCLIFFE INST. NEWS & IDEAS at 2 (Mar. 11, 2022).[23]

COVID continues to infect inmates at Carswell. *See* Exhibit 1 ¶ 28. Although Carswell is not regularly testing inmates, it is assuming COVID status and quarantining them. *Id.* In September of this year, 40 inmates were quarantined in an area on the floor of a unit, and in late October, another 41 inmates were quarantined in a different area. *Id.* Although the latest official data indicates only ten "Open Cases," *see* https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData (last visited

---

[21] https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (defining level indicators for prison operations affected by COVID outbreaks) (last visited Dec. 11, 2023).

[22] FMC Carswell has a population of 984 inmates, with 136 inmates at the camp. https://www.bop.gov/locations/institutions/crw/ (last visited Dec. 11, 2023).

[23] https://www.radcliffe.harvard.edu/news-and-ideas/the-prison-as-petri-dish (Exhibit 7); *see also* Kaley Johnson, *Women's prison in Fort Worth again 'full of COVID,' 2 die from virus at men's prison*, FORT WORTH STAR-TELEGRAM (Jan. 24, 2021) (Exhibit 8), *https://www.star-telegram.com/news/local/crime/article248735465.html* ("FMC Carswell had the second most COVID-19 cases out of all federal prisons as of Sunday, behind only Pollock FCI in Louisiana (285 cases), according to Bureau of Prisons data. Carswell is the only medical facility for women in federal custody in the country — most of the women have health problems or are elderly.").

Dec. 7, 2023), experts note that the reported numbers are likely a drastic undercount, given that testing and reporting vary by agency and nearly half of the nation's jails and prisons did not report COVID data. Law, *The Prison as Petri Dish*, Harvard Radcliffe Inst. News & Ideas at 2. "Even the agencies that do report COVID data to the public often define the variables in ways that are confusing, misleading, and generally unclear," said Joshua Manson of the UCLA Law COVID Behind Bars Data Project. "It obscures the data and obscures the reality of COVID in their facilities." *Id.*

Second, because of her comorbidities and custodial status, Dr. Hamilton "is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease." USSG § 1B.13(b)(1)(D)(ii).  The CDC has confirmed that older adults like Dr. Hamilton are at a greater risk of getting very sick or dying from COVID-19. Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (May 11, 2023).[24] The CDC has also identified the following conditions as increasing the risk of serious and potentially lethal consequences to contracting COVID-19: chronic lung diseases, including COPD and "Moderate to Severe Asthma;" heart disease, including hypertension; immuno-compromised condition or weakened immune system; and obesity. *Id.* It has warned that "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases." *Id.* Dr. Hamilton's medical records document each of these risk factors. *See* Exhibit 1 ¶ 27 and 1-B; *see also* part I.A.2.

Indeed, Carswell has already decided that Dr. Hamilton satisfies the relevant criteria by approving her for release to home confinement under the CARES Act. *See* Exhibit 1-B. Under

---

[24]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 11, 2023).

memoranda from the Attorney General and BOP, to be eligible for CARES Act release, and to approve her request, Carswell had to be satisfied that Dr. Hamilton "had particular COVID-19 risk factors, as described in the CDC guidelines." OIG Capstone Report at 32-33.

Third, this risk "cannot be adequately mitigated in a timely manner." *Id.* Carswell has one of the worst records for COVID management in the country. *See* Law, *The Prison as Petri Dish*, Harvard Radcliffe Inst. News & Ideas at 1-2 (describing prison's inadequate handling of COVID exposures and illnesses). Just last month, a federal judge ordered discovery and a chance to replead claims for the mother of an inmate who died from COVID-19 after contracting the virus at Carswell. *See LeBeau v. United States*, No. 4:23-cv-4038, 2023 WL 7413658, at *6 (S.D.S.D. Nov. 9, 2023). The mother brought suit under the Federal Tort Claims Act alleging that her pregnant daughter was "housed in crowded, unsafe, and unsanitary conditions where she contracted Covid-19." *Id.* at *1.

Carswell is currently experiencing extreme overcrowding conditions because it had to close one of its two residential buildings due to structural safety issues. Exhibit 1 ¶ 6. It has doubled the number of inmates in the remaining buildings as a result. *Id.* Dr. Hamilton is currently sharing a room with five other women, even though it is designed for three inmates. *Id.* The rooms and bathrooms they share are squalid with black mold on the walls and asbestos in the carpets. *Id.* ¶ 24. The inmates are not provided adequate personal protection equipment—they are given only single-use paper masks and prohibited from obtaining N95 or even reusable cloth masks. *Id.*; *see also* Miltonette Oliver Craig, Mijin Kim, and Dawn Beichner-Thomas, *Incarcerated in a Pandemic; How COVID-19 Exacerbated the "Pains of Imprisonment*," 2023 GA. STATE CRIM. J. REV. 1, 7, 9 (July 27, 2023) ("PPE available in most prisons and jails consists of non-surgical masks only.").[25]

---

[25] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10375228/ (Exhibit 9).

**2. Inadequate long-term and specialized medical care.**

A second, independent ground for compassionate release is that Dr. Hamilton has not received the specialized medical and rehabilitative care she was promised at Carswell, and her chronic health conditions have been exacerbated by the conditions there. *See* USSG § 1B1.13(b)(1)(C). Before her incarceration, Dr. Hamilton informed the Court that she was suffering from severe and pervasive medical conditions, including herniated discs in her spine and neck and a dental condition requiring intensive endodontic treatment. *E.g.*, Dkt. ##315, 316, 323, 324, 328, 331. She substantiated these conditions with medical records detailing her medical needs and prescribed treatments. *Id.* The Government opposed this relief, claiming:

> The Bureau of Prisons' Health Services Division administers the Office of Medical Designations and Transportation ("OMDT"), responsible for the timely and efficient designation and movement of inmates with health care needs. Annually, OMDT performs medical reviews and designations for approximately 20,000 inmates who have acute, chronic, terminal, and [un]resolved medical illnesses, and the Bureau of Prisons provides medical and psychiatric care to more than 40,000 inmates each year. Federal Medical Center Carswell is one of seven Bureau of Prisons facilities specially designed to assist inmates with medical care, including the most complex medical issues requiring the highest level of care, and the only one dedicated to female inmates. ***The care at Federal Medical Center Carswell includes not only medical and mental health treatment, but dental care***. Federal Medical Center Carswell is accredited by the Joint Commission and has two units that provide services like nursing homes would. ***Care that is not provided on location, like surgical procedures, is provided at a local hospital or dental clinic. There is no evidence that the Bureau of Prisons, especially at Federal Medical Center Carswell, cannot adequately care for Defendant***.

Dkt. #329 at 1-2 (emphasis added); *see also* Dkt. #330 (sealed exhibit containing similar promises).[26]

_____

[26] The letter submitted by the Government under seal was from a non-physician BOP health official, who was the Regional Medial Director, SCR, and failed to address many of the critical needs Dr. Hamilton raised. The letter simply recited that "Dr. Hamilton will be monitored, evaluated, and treated by his [sic] assigned primary care physician …" and that "the Bureau will be able to provide appropriate care for Dr. Hamilton." *See* Dkt. #331 at 1-2.

Dr. Hamilton has not received adequate care at Carswell for her conditions—both pre-existing and those that have incepted since her incarceration. She was able to manage the pain from her seriously herniated discs in her back and neck in her home with consistent and diligent self-management, including use of an inversion table, physical therapy, and a prescription for Gabapentin. Exhibit 1 ¶ 19. Now, she is being prescribed large doses of ibuprofen that are causing ulcers, and steroids that are only somewhat effective to manage the pain and are compromising her immune system. *Id.* ¶ 19. She has received only two epidural steroid injections (ESIs), many months apart and only after she pursued administrative remedies. *Id.* ¶ 17. Her spinal condition has significantly worsened, as shown by her most recent MRI. *See id.* ¶ 21 & Exhibit 1-A at YLH0384-85 ("Degenerative anterolisthesis of L3 on L4," "Moderate degenerative thecal sac narrowing at L3-4 and L4-5," and "Variable multilevel neuroforaminal narrowing … most advanced at L3-4 on the right"); *see also* Exhibit 1-A at YLH0252, 271-72; *id.* at 367 ("MRI lumbar spine [] dated 4/26/23 demonstrates degenerative anterolisthesis L3 on L4 with significant central canal stenosis at this level. There is also moderate central canal stenosis at L4/L5 and L5/S1."). The neurosurgeon that BOP finally referred Dr. Hamilton to in May 2023, Dr. Domenico Gattorzi, reported that her "[p]ain has now progressed in severity" and that "since being incarcerated, her symptoms have progressed." Exhibit A at YLH0376. Dr. Gattozzi prescribed laminectomies and fusion surgery. Exhibit A at YLH0376-77.[27]

Dr. Hamilton was successfully managing her hypertension before she reported to the Carswell facility. *Id.* ¶ 23. Since being there, her blood pressure has continued to rise, and she has been prescribed increasingly higher doses of medication. *Id.* The uncontrolled pain from her spinal

---

[27] Dr. Hamilton refused the surgical option as an inmate because she understandably had concerns about the care that might be provided and believed at the time that she would soon be released to go home to Houston where she had better treatment and surgical options. Exhibit 1 ¶ 18.

conditions, stress from lack of adequate treatment for her health, and gaps in BOP's provision of her hypertension medication have significantly impacted her ability to control her blood pressure. *Id.*

While at Carswell, she has also developed COPD and asthma from the environmental conditions, including black mold, asbestos, and most recently, sandblasting. Nevertheless she has yet to be seen by a pulmonologist. *Id.* ¶¶ 24-26. Dr. Hamilton also contracted a respiratory illness in May, causing heavy, deep coughing, that was not adequately treated and developed into pneumonia and was not resolved until November. *Id.* ¶ 25.

Dr. Hamilton's experience is not unique. Carswell has been repeatedly exposed for failing to deliver adequate care to inmates with known health risks. "Once dubbed a 'hospital of horrors,' the Fort Worth prison is the only federal medical facility for incarcerated women in the country. It lost its accreditation during the pandemic and has not gotten it back." Hannah Phillips, *Inexcusable: Attorney blasts federal prison officials over Boca woman's medical care*, THE PALM BEACH POST (Oct. 27, 2023) (describing unfulfilled, pre-incarceration promises to inmate suffering from seizure disorder that she would receive adequate treatment: "'People come in here walking and leave in wheel chairs. People die here … I don't want to be one of them.'").[28]

In September of this year, another former Carswell inmate reportedly died within 24 hours after being released from the Carswell camp. *See* Gloria Way, *Former County HR Director Tocarra Green Passes Away*, SEABREEZE BEACON (Oct. 3, 2023)[29] ("Green had been released from the Federal Medical Center Carswell Camp, a prison for women in Fort Worth a couple of weeks

---

[28] https://www.palmbeachpost.com/story/news/crime/2023/10/27/south-florida-woman-suzanne-kaye-fears-brief-stint-in-texas-prison-carswell-will-kill-her/71117755007/ (last visited Dec. 11, 2023) (Exhibit 10).

[29] https://theseabreezebeacon.com/former-county-hr-director-tocarra-green-passes-away/ (last visited Dec. 11, 2023) (Exhibit 11).

ago. She had been released to her husband and died within 24 hours. She is said to have had trouble breathing.").

In May of this year, a federal judge found that inmate Jacqueline Graham met the pre-amendment "standard for 'extraordinary and compelling reasons' because she continues to suffer from numerous serious medical conditions for which, in some cases, [FMC] Carswell has not given her adequate treatment." *United States v. Graham*, No. 16 CR 786 (NSR) (02), 2023 WL 3222483, at *4 (S.D.N.Y. May 3, 2023) (although declining to grant relief because the defendant "was the architect of a serious and complex crime that involved large sums of money and many victims" and had served only a fraction of her 132-month sentence).

Another inmate identified as "Marie" and described as a 56-year-old Black woman sentenced to 75 years for Medicare fraud and incarcerated at FMC Carswell, wrote to a judge asking for compassionate release:

> I have not been getting the treatments I should be getting for my stage 4 breast cancer. … I am at risk to contract corona because of my terminal status. … My condition has changed completely since I was detained and came to prison … The way things are going regarding my treatments [here] can lead me to my grave.

Craig, et al., *Incarcerated in a Pandemic*, 2023 GA. STATE CRIM. J. REV. at 7, 9. "Marie" was denied that relief, contracted COVID, and died soon afterward. *Id.* at 9.

### 3. Substantially diminished ability to provide self-care.

For many of the same reasons described above in parts II.A.1 and 2, Dr. Hamilton is unable to provide the level of self-care necessary to manage her health conditions. She was able to manage her preexisting conditions before entering Carswell, but the conditions at Carswell make it impossible to do so in custody. *See* part II.A.2. The overcrowding of her room and bathroom, lack of access to adequate medical and hygienic materials, constant exposure to mold, asbestos, and sandblasting, and even the mattress on which she sleeps are all exacerbating her conditions. Exhibit

1 ¶¶ 19-20. She has tried, with minimal success, to obtain accommodations, such as wedge pillows and an additional mattress *Id.*

*   *   *

Notably, Warden Smith did not even mention Dr. Hamilton's medical conditions or Carswell's treatment and conditions in denying Dr. Hamilton's November 1 request for compassionate release. Exhibit 3-G. Instead, he referred only to her family circumstances: "Currently you do not meet the criteria for a Reduction in Sentence Based on Non-Medical Circumstances – Death or Incapacitation of the Family Member Caregiver." *Id.*

Each of Dr. Hamilton's ***medical*** circumstances, independently, justifies the requested relief. Taken together, they present a compelling case in point for heeding the recommendation of the OIG to use home confinement more effectively as an alternative, as well as the message of the Sentencing Commission in the newly amended compassionate-release Guidelines to send home non-violent inmates who are medically vulnerable and fragile.

## B. Family Circumstances

The consequences of keeping Dr. Hamilton at Carswell will be catastrophic both to Dr. Hamilton and her family members, who depend on her. Certain family members have experienced substantial adverse effects from her criminal prosecution, and the situation has only worsened with her incarceration.

Dr. Hamilton's family desperately needs her care at this time, and the situation is becoming dire. *See* Exhibit 1 ¶ 12; Exhibit 2 ¶¶ 2-7. Dr. Hamilton was the primary caregiver for these family members before her incarceration, and she has demonstrated her commitment to her family throughout the pendency of these proceedings. Her immediate presence back in her home is critical.

Although her family circumstances may not technically meet the requirements of § 1B1.13(b)(3), the Commission also made clear that considerations of similar gravity to the enumerated grounds may be considered singly or in combination, § 1B1.13(b)(5) ("The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described.").

### III. A reduction of sentence is consistent with the 18 U.S.C. § 3553(a) factors.

Section 3582(c)(1)(A) also mandates consideration of the § 3553(a) factors "to the extent they are applicable." 18 U.S.C. § 3582(c)(1)(A). The requested modification of Dr. Hamilton's sentence is fully consistent with the § 3553(a) factors.

This Court properly considered the § 3553(a) factors at the time of Dr. Hamilton's original sentencing. But two of those factors have now changed and carry much more weight than at the time of sentencing, namely: (1) "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and (2) "the need for the sentence imposed . . . to provide the defendant with . . . medical care . . . in the most effective manner," 18 U.S.C. § 3553(a)(2)(D). Dr. Hamilton's "history and characteristics" now include additional and exacerbated medical conditions (as well as a family crisis), that the amended Sentencing Guidelines have indicated must be taken into account, and so the Court must now consider the need "to provide [Dr. Hamilton] with . . . medical care [for those conditions] . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D); *see also United States v. DiMasi*, 220 F. Supp. 3d 173, 176-77 (D. Mass. 2016) (health conditions suffered by the defendant while in custody are part of his "history and characteristics" weighing in favor of reducing his sentence).

The BOP will likely claim—as it did prior to her incarceration—that it is capable of providing adequate medical care and treatment for Dr. Hamilton's conditions. The record proves otherwise. *See* part II.A; *see also, e.g., Zunkel*, 9 NOTRE DAME J. INT'L L. at 57 ("It has become

clear that the BOP is not equipped to provide inmates with some of the most basic treatment and rehabilitative services, including effective medical care and mental health care.") & 59 ("The BOP faces numerous challenges in providing adequate, let alone effective, medical care to inmates." (footnote omitted)); Natalie Hinton, Comment, *Curing the BOP Plague with Booker: Addressing Inadequate Treatment in the Bureau of Prisons,* 41 J. MARSHALL L. REV. 219, 231 (2007) ("The BOP cannot claim to meet the medical needs of its inmates when it has been overpopulated and understaffed for years.").

Importantly, though, relief is warranted even without finding that the BOP lacks competent care. Dr. Hamilton is in "extraordinary" straits under § 3553(a)(2)(D)—and her conditions will be treated "in the most effective manner" at the Houston Medical Center near her home. Because "the evidence shows that the care within the BOP falls woefully below that standard," Zunkel, 9 NOTRE DAME J. INT'L L. at 57, and because the Houston Medical Center has the best treatment facilities for all of Dr. Hamilton's conditions, § 3553(a)(2)(D) strongly militates in favor of reducing her sentence. *See, e.g.*, *DiMasi*, 220 F. Supp. 3d at 177 ("DiMasi's release w[ould] also serve the interest of providing him with the most effective medical treatment in another way.").

By contrast, BOP suffers from general and medical staffing shortages, delays in treatment, and problems in recruiting medical personnel. *See, e.g.*, Zunkel, 9 NOTRE DAME J. INT'L L. at 59; *see also* OIG Capstone Report at ii ("We found that the COVID-19 pandemic exacerbated the effects of preexisting BOP medical and nonmedical staffing shortages, increased staff workloads, and impeded facilities' ability to fully respond to the pandemic."). As Dr. Hamilton's prison experience demonstrates, the delays in outside medical consultations and treatment are presumably attributable to these factors. There can be little question that treatment in Houston will be more efficient, less burdensome, and more likely to be successful than the severely compromised

medical care options and environment she faces while in custody. Compassionate release would allow Dr. Hamilton to use her own resources to provide for her own healthcare,[30] protect herself from COVID and other infectious disease, take care of her family, and continue her education so that she can become gainfully employed again.[31]

The remaining § 3553(a) factors either support a reduction of Dr. Hamilton's sentence or are neutral. Dr. Hamilton is a 60-year-old, first-time, non-violent defendant and poses no threat to anyone's safety. *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), at 3 ("Over an eight-year follow-up period, 13.4 percent of offenders aged 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased.").[32] She has amply demonstrated her commitment to serving others, both as a medical doctor and citizen.

Under memoranda from the Attorney General and BOP, to be eligible for CARES Act release, and to approve her request, Carswell had to be satisfied that Dr. Hamilton: (1) "had

---

[30] Dr. Hamilton has private health and dental insurance. *See* Exhibit 1 ¶ 40. To release Dr. Hamilton to seek treatment in the Houston Medical Center with her own resources will also save the BOP a considerable amount of money. Prisoners over the age of 50 "already cost three times as much to incarcerate [as younger prisoners,] due to increased health care costs." Casey N. Ferri, *A Stuck Safety Valve: The Inadequacy of Compassionate Release for Elderly Inmates*, 43 STETSON L. REV. 197, 197 (2013).

[31] As the Court is aware, during her appeal Dr. Hamilton completed three terms in a master's program in Legal Studies focusing on Healthcare and Business Compliance at American University College of Law in Washington, D.C. (participating remotely) with a GPA of over 3.9. Exhibit 1 ¶ 39. She has not been able to continue those studies in Carswell. *Id.* But if permitted to return home, she can complete the last two semesters with the financial help of her extended family. *Id.*; *see also* Exhibit 2 ¶ 9.

[32] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last visited Dec. 11, 2023).

particular COVID-19 risk factors, as described in the CDC guidelines;" (2) had not committed "a crime of violence, a sexual offense, or terrorism;"(3) posed no threat to the community, (4) had no history of serious misconduct while incarcerated, and (5) presented a verifiable re-entry plan. OIG Capstone Report at 32-33. In finding that she did, the BOP has ceded these points.

A reduction of Dr. Hamilton's sentence as requested would not disserve the factors set out in 18 U.S.C. § 3553(a)(2)(A) (the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" of conviction); 18 U.S.C. § 3553(a)(2)(B) (the need for the sentence imposed "to afford adequate deterrence to criminal conduct"); and 18 U.S.C. § 3553(a)(2)(C) (the need for the sentence imposed "to protect the public from further crimes of the defendant").

Moreover, as Dr. Hamilton's medical license has been suspended because of the criminal proceedings, she will not be able to practice medicine. The requested reduction in sentence will not minimize the seriousness of the offenses and will provide just punishment for those offenses, as well as adequate general deterrence.

Dr. Hamilton has served 14 months of her 60-month sentence (23%). With the recent amendments to the "good time" statute, 18 U.S.C. § 3624(e), a 60-month sentence translates into a 51-month sentence, of which she has served over 27%. Moreover, with earned time credit under the First Step Act, the sentence will be whittled down even more substantially. Under the First Step Act, she will likely only have ___ months before she is eligible for release to a halfway house, as she has a negative PATTERN score, has already completed 14 FSA-approved classes, has been complying with her Financial Responsibility Payments, and worked for several months before her job was terminated due to BOP concerns about her health. Exhibit 1 ¶¶ 33-35. She is continuing to seek employment at Carswell but has not yet been able to secure a position. *Id.* ¶ 35. She has

had only one minor, nonviolent disciplinary issue involving a three-way phone call that she did not know violated policy, and the matter is on appeal. *Id.* ¶ 36.

Finally, § 3553(a)(4) and (5) mandate consideration of the Sentencing Guidelines and the Sentencing Commission's policy statements. The Sentencing Commission advises that age and illness may be reasons for departing or varying below the range recommended by the Guidelines. *See* USSG § 5H1.1 (p.s.); USSG § 5H1.4 (p.s.). And, as explained, the amended Guidelines also expressly permit consideration of these factors in reducing a sentence. *See* part I.

**PRAYER**

For these reasons, Dr. Hamilton requests that the Court reduce her sentence to time served or, in the alternative, probation with or without home confinement, and grant such other and further relief to which she is entitled.

Respectfully submitted,

/s/ *Marcy Hogan Greer*
Marcy Hogan Greer
Attorney-in-Charge
State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

Samuel J. Louis
Texas Bar No. 12588040
samuel.louis@hklaw.com
HOLLAND & KNIGHT
1100 Louisiana, Suite 4300
Houston, Texas 77002
(713) 244-6860
(713) 821-7001 Fax

James Turner
State Bar No. 20316950
GREGOR WYNNE ARNEY PLLC

jturner@gwafirm.com
700 Louisiana, Suite 3950
Houston, Texas 77002
(832) 390-2644

ATTORNEYS FOR YOLANDA HAMILTON, M.D.

### CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(D), I certify that on December 11, 2023, I conferred with Catherine E. Wagner, counsel for the United States of America, and she indicated that the government opposes the requested relief.

/s/ *Marcy Hogan Greer*
Marcy Hogan Greer

### CERTIFICATE OF SERVICE

On December 12, 2023, I electronically filed this motion with the Clerk of Court using the Court's CM/ECF electronic filing system, which will serve notification the filing on all counsel of record in accordance with the Federal Rules of Criminal Procedure.

*/s/ Marcy Hogan Greer*
Marcy Hogan Greer