United States of America,            §
                                     §
        *Plaintiff,*                 §
                                     §
v.                                   §    Case No. 4:17-cr-00418
                                     §
Yolanda Hamilton, M.D.,              §
                                     §
        *Defendant.*                 §

---

**DEFENDANT'S SUPPLEMENT IN FURTHER SUPPORT OF MOTION FOR
REDUCTION IN SENTENCE**

Defendant, Yolanda Hamilton, M.D. ("Dr. Hamilton") files this supplement in further

support of *Defendant Yolanda Hamilton M.D.'s Motion for Reduction in Sentence* (Dkt. #339)

("Motion").

1.      Dr. Hamilton submits this supplement to bring to the Court's attention a recent study

from the United States Bureau of Prisons, which shows that "the CARES Act's provision for early

and extended home confinement did not negatively impact recidivism rates." *See* Jason Gwinn,

Ph.D., *CARES Act: Analysis of Recidivism*, U.S. Dept. of Justice, Federal Bureau of Prisons Info.

Tech.        &        Data        Div.,        https://www.bop.gov/resources/research_projects/

published_reports/recidivism/202403-cares-act-white-paper.pdf (Mar. 2024) (Ex. A).

2.      In a press release issued with the publication of this study, BOP reported that "the

CARES Act's provision for early and extended home confinement … may have contributed to a

reduction in post-release recidivism, offering a promising direction for justice-involved stakeholders

seeking effective strategies to reduce incarceration and its associated costs, while also promoting

public safety and successful reintegration into society." U.S. Dept. of Justice, Fed. Bur. of Prisons, *CARES Act Shows Promise in Reducing Recidivism, Reinforcing the Benefits of Reduced Incarceration*, https://www.bop.gov/resources/news/pdfs/20240329-press-release-cares-act.pdf (Mar. 29, 2024) (Ex. B). "This study serves as a testament to the benefits of innovative, compassionate approaches to criminal justice." *Id.*

3. In that press release, BOP Director Colette Peters commented that:

This study reinforces my belief, shaped by decades of experience in corrections, that alternatives to mass incarceration are the most effective approach. The findings that individuals with a CARES assignment recidivated no more or less than comparable people in home confinement, and even less often post-release, are encouraging. This study suggests that reducing incarceration for appropriate people through measures like early and extended home confinement does not compromise public safety and in fact, suggests it may contribute to successful reintegration into society.

*Id*. Dr. Hamilton fits the definition of being appropriate for release—she has no prior criminal history, is no risk to society, and most importantly, she is not getting adequate medical care for her serious and worsening conditions.

4. In particular, Dr. Hamilton informed the Court in her reply brief that she suffered a fall on January 9, 2024, on the concrete walkway at Carswell. Dkt. #348 at 7-8. That fall significantly injured her right knee and right shoulder. Ex. C at YLH000512-13. Initial x-rays did not reveal any fractured bones, but an examination during physical therapy revealed "positive special testing for both a lesion in the rotator cuff and the meniscus." *Id*. She is also suffering increased pain in her already compromised back since the fall. *Id.* The only treatment she has received is limited physical therapy, *id.* at YLH000487 ("Instructed the patient to take it easy when trying to increase her activity level but encouraged her to at least do some light ROM on the days she is not feeling her best."), and massive doses of ibuprofen. *Id*. Although an MRI has been requested, *id.* at YLH000487, 503, 513-14, 518, 520, as of today, and a call today from Dr. Hamilton confirms that an MRI has still not been scheduled.

5.      The BOP's dilatory pace in addressing this medical problem is yet another indication that the BOP is not the entity that can "provide [Dr. Hamilton] with needed . . . medical care . . . in the most effective manner," 18 U.S.C. § 3553(a)(2)(D)—a sentencing factor that takes on enhanced importance for older inmates with compound and serious medical conditions, like Dr. Hamilton.

## PRAYER

For these reasons and the ones set forth in her Motion for Reduction in Sentence and reply, Dr. Hamilton prays that the Court grant the requested relief.

Respectfully submitted,

/s/ *Marcy Hogan Greer*
Marcy Hogan Greer
State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE & JEFFERSON LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

Samuel J. Louis
Texas Bar No. 12588040
samuel.louis@hklaw.com
HOLLAND & KNIGHT
1100 Louisiana, Suite 4300
Houston, Texas 77002
(713) 244-6860
(713) 821-7001 Fax

James Turner
State Bar No. 20316950
GREGOR WYNNE ARNEY PLLC
jturner@gwafirm.com
700 Louisiana, Suite 3950
Houston, Texas 77002
(832) 390-2644

ATTORNEYS FOR YOLANDA HAMILTON, M.D.

**CERTIFICATE OF SERVICE**

On April 16, 2024, I electronically filed this motion with the Clerk of Court using the Court's CM/ECF electronic filing system and served all counsel of record via email in accordance with the Federal Rules of Criminal Procedure.

*/s/ Marcy Hogan Greer*
Marcy Hogan Greer

EXHIBIT A

**U.S. Department of Justice, *Federal Bureau of Prisons***
Information Technology & Data Division
Office of Research & Evaluation



March 2024

BRIEF TECHNICAL EVALUATION REPORT

# CARES Act: Analysis of Recidivism
## Jason Gwinn, PhD

### Key Findings

After release from FBOP custody, and when compared to matched people who were sent to home confinement under non-CARES circumstances, individuals with a CARES assignment were less likely to recidivate in the year following release from custody (3.7% vs. 5.0%), and marginally less likely to be re-arrested for violent offenses (0.9% vs. 1.3%).

Overall, the use of CARES Act to send individuals with a health vulnerability to home confinement sooner and for longer periods did not have an apparent negative impact on their recidivism rates compared to others in home confinement with similar profiles.

## INTRODUCTION

Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) on March 25, 2020, early in the COVID-19 pandemic. Among other changes, this Act allowed individuals in federal correctional facilities who were a Low- or Minimum- security risk and had Centers for Disease Control-established COVID-19 risk factors to serve their sentence in home confinement earlier than they would have been eligible to do so without the CARES Act, and for potentially longer periods of time. The Federal Bureau of Prisons (FBOP) released guidance to its employees the next day, and the first home confinement placements under the CARES Act followed soon after.

*1. Failures during Home Confinement:*

This study investigated whether rates of FBOP home-confinement failure (before release from FBOP home confinement) differed between individuals in custody with a CARES home confinement placement compared to similar, matched persons in home confinement whose length of community placement was statutorily constrained.

*2. Failures after release from FBOP Home Confinement:*

Also, this study examined the recidivism rates of people with and without a CARES home confinement placement after being released from FBOP custody.[1]

In both samples, recidivism was defined as a return to a FBOP correctional facility or a re-arrest, whichever came first. Additionally, violent recidivism was measured using re-arrests for violent offenses, and was analyzed only for the second sample who were released from FBOP.

## CARES Act Eligibility

FBOP issued guidance in April 2020 and April 2021 defining eligibility criteria for a CARES Act assignment (CARES assignment).[2] Initially,

---

[1] Note that release from FBOP home confinement merely marks the end of FBOP's custody and monitoring. Some home confinement may or may not continue under Federal Probation's supervision afterwards, depending on the particular case. This study is only focused on the CARES Act and FBOP's home confinement placement.
[2] For matching, this study used the best available variables which corresponded to these criteria.

persons with a CARES assignment were required to be in Minimum or Low security, have a clean misconduct record for the past year, have no violence or gang-related misconduct, have a re-entry plan (including having a home to be confined in), be minimum recidivism risk on the PATTERN risk assessment, and have a CDC-defined COVID risk factor that could be identified. Guidance also directed employees to consider the offense for which the individual was incarcerated when considering eligibility.

In April 2021, guidance was updated in four ways. First, the Warden could use discretion to refer an individual under the CARES Act authority to those with minor misconduct incidents[3] in the past year. Second, an individual eligible for CARES Act consideration due to a COVID risk factor was also required to have served at least 50% of their sentence or to have served at least 25% with no more than 18 months remaining to serve. Third, in addition to minimum recidivism risk, individuals with Low recidivism risk were also to be considered eligible. Fourth, individuals could not have any current or prior offenses related to violence, sex, or terrorism.[4] In addition to the above eligibility criteria, after April 2021, a committee at FBOP headquarters reviewed and released additional individuals who were borderline eligible (e.g., within 48% of release) who otherwise had qualitative reasons for being released from secure custody despite falling short on the objective criteria.

## Simple comparison shows lower recidivism with CARES assignment

Running a simple comparison of those with and without CARES assignment demonstrates the need for the creation of comparable groups.

Findings indicate that a straight comparison without matching shows much more marked differences in recidivism rates than after matching is conducted.

.For the full pre-release dataset, 4.6% of individuals with a CARES assignment were re-arrested or returned to a FBOP correctional facility while in home confinement, compared to 6.9% of individuals in home confinement without a CARES assignment. After release from home confinement, those with a CARES assignment had a 3.6% recidivism rate over one year whereas those without a CARES assignment had a 13.0% recidivism rate. Without matching, this result was expected, because regardless of the effect of the CARES assignment itself, CARES Act release consideration required individuals to be Low recidivism risk, with therefore expectedly lower recidivism rates.

## Matched comparison shows lower recidivism with CARES assignment only after release

The difference in recidivism rates became smaller after matching those with a CARES assignment to similar people without a CARES assignment. For the pre-release dataset, the recidivism or failure rates were 4.2% for individuals with a CARES assignment and 1.3% for persons without one. That difference would appear to be important, yet statistical power is rather low and the sample too small to conclude the difference is any more than a chance occurrence. For the post-release dataset, individuals with a CARES assignment had a 3.7% recidivism rate as compared to 5.0% for matching persons without one, which was confirmed as a significant difference.[5] Also for

---

[3] Defined as 300 and 400 level offenses within FBOP's disciplinary regulations. See 28 C.F.R. §.541.3, Table 1.
[4] Individuals with sex offenses were ineligible for home confinement generally, with or without any special prohibition in the April 2021 CARES guidance.

[5] Note that this study did not match based on time in home confinement for the post-release sample and did not require the control group to have spent time in home confinement. That refinement was a necessary requirement for the control group in the pre-release sample. If one does

the post-release dataset, those with a CARES assignment had a 3.7% recidivism rate as compared to 5.0% for matching those without a CARES assignment.

For the matched pre-release dataset, the recidivism window is inconsistent from one individual to the next, so this study used a Cox Proportional Hazard Model instead of the usual logistic regression model, accounting for whether and *when* the released individual recidivated. Cox Proportional Hazards models factor time out of the effect calculation. The matching process controls for all other factors, so the analysis used the CARES assignment as the only predictor of recidivism, which did not significantly impact the risk of recidivism pre-release ($\chi^2 = 2.27$, $p = .131$, Hazard Ratio = 1.266) compared to other persons in home confinement. The recidivism or failure rates were 4.2% for individuals with a CARES assignment and 1.3% for individuals without one.

In the matched post-release dataset, the analysis utilized the CARES assignment as the

sole predictor of 1-year recidivism, but with a logistic regression model instead of a Cox model. Those with a CARES assignment recidivated significantly less than comparable persons who did not receive a CARES assignment ($\chi^2 = 12.23$, $p = .0005$, Odds Ratio = 0.724). Persons with a CARES assignment had a 3.7% recidivism rate as compared to 5.0% for matched persons without one.

This study repeated the same test with violent recidivism, using a slightly different matched dataset. People with a CARES assignment violently recidivated marginally significantly less than comparable people who did not receive a CARES assignment ($\chi^2 = 3.53$, $p = .0602$, Odds Ratio = 0.710). The violent recidivism rates were 0.9% for people with a CARES assignment and 1.3% for those without one. With a marginally significant effect, the results suggest a possible reduction in violent recidivism but fall short of the usual scientific standards for significance.

---

match on home confinement in the post-release sample, this study found no effect of a CARES assignment on recidivism..

**U.S. Department of Justice, *Federal Bureau of Prisons***
Information Technology & Data Division
Office of Research & Evaluation



March 2024



Figure 1. Recidivism rates for matched and unmatched Individuals with and without a CARES assignment

## Conclusions

Overall, the use of the CARES Act to send individuals to home confinement sooner and for longer periods did not have an apparent negative impact on their recidivism rates compared to others in home confinement. Results indicate that while in home confinement individuals with a CARES assignment fail no more or less than comparable persons in home confinement. And those with a CARES assignment fail less often than comparable persons after release.

This study does have important limitations in its design. First, the results of matching only apply to matched individuals in the analysis. A large number of the cases were not included in the final models, including some individuals with a CARES assignment, because no comparable match could be found. It is possible that the effect of the CARES Act releases may have been different for those noncomparable individuals, and this study would not be able to show

that. In short, the results do not generalize to all persons in FBOP custody.

Second, matching assumes that when predicting a CARES assignment, any unexplained variance is essentially random or at least is unrelated to recidivism. This assumption cannot be tested. There is subjectivity to some of the eligibility criteria for CARES Act release, which is likely part of the unexplained variance. Ultimately, CARES Act consideration and release are not offered randomly to provide a truly comparable experiment, even after accounting for the explicit eligibility criteria as best as possible, so it is difficult to confirm that the matched comparison group is a true experimental comparison, even as a quasi-experimental design.

Overall, this study tentatively concludes that post-release recidivism (and possibly post-release violent recidivism) is reduced for individuals with a CARES assignment, though the reasons for this result are unclear at this time.

# Methodology

It is important to note some distinguishing language in FBOP populations. A person is still considered to be in FBOP custody while in a placement of home confinement – if FBOP made that placement. They are still serving the term to which they were sentenced and are therefore still in custody. Interpretations of terminology regarding pre- and post-release status in this study should be mindful of this caveat. Second, as it pointed out in the narrative, recidivism is defined by either being re-arrested or returning to a correctional facility, whichever occurs first. Being returned to a correctional facility refers to a traditional prison, rather than a placement in home confinement. Recidivism was further analyzed for those who had been released from home confinement, in the post-release comparisons, examining re-arrest for violent offenses. Finally, this study was strictly exploratory, leaving more to study regarding the relationship between placements and outcomes. Further and more detailed clarifications can be found in the following.

## Creating Pre-release and Post-release Datasets

This study assembled two datasets from FBOP's management database. There is some overlap in the members of the two datasets:

To examine home confinement failure before release from FBOP custody, the first dataset included everyone with a FBOP home confinement assignment between March 1, 2020 and December 31, 2022. This group included 41,674 individuals, of whom 12,181 were given a CARES assignment. In this dataset, re-arrest was only relevant for the period when the individual was in home confinement, not after release.

To examine post-release recidivism and violent recidivism, the second dataset included any person released from FBOP custody (with or without a prior home confinement assignment) between March 1, 2020 and January 30, 2022. The latter date is one year before the collection of the re-arrest data from the National Law Enforcement Telecommunications System (NLETS). Individuals were excluded from this analysis if they had a detainer, meaning another agency took custody of the individual upon FBOP release (e.g., to serve a state prison sentence or for execution of a deportation order). This exclusion left 98,185 cases, of whom 8,710 were given a CARES assignment at some point prior to release.

## Matching Overview

Within each of the two main datasets (the home confinement dataset and the post-release dataset), matching was used to create a group that had a CARES assignment, and a group that was comparable but did not have a CARES assignment. This facilitates a fairer comparison of similar individuals, with only the CARES assignment differentiating them.

This analysis was conducted with propensity score matching (PSM). Other research designs were considered that would have been more internally valid than PSM, but they were not feasible. In theory, a regression discontinuity analysis could be done with the classification tool misconduct risk scores (used to classify individuals to a correctional-facility security level) and/or the PATTERN recidivism risk scores (used to determine early release), since only certain security levels and PATTERN recidivism risk levels were eligible for CARES Act consideration. However, classification tool scores[6] determine security levels in addition to CARES Act eligibility and would confound the effects of the two. Also, at the time of this study, FBOP had only been recording final PATTERN risk levels rather than the continuous PATTERN score, so analysis with the total

---

[6] The FBOP's risk prediction instrument, Bureau Risk Assessment Verification and Observation (BRAVO) was designed to predict serious misconduct in prison.

PATTERN scores was not possible.[7] Additionally, any pre-post design would not separate the effect of CARES Act releases from the effect of the COVID pandemic, since they both happened simultaneously. Matching was the best available methodology.

**TABLE 1 Candidate matching variables**

| Variable Name | Coding, Detail, and Source |
|---|---|
| PATTERN risk level | Set of 3 dummy codes for Low, Medium, or High risk, with "minimum" as reference. |
| Security level | Dummy code for Medium/High vs. Low/Minimum. Determined by classification tool score and other FBOP policies. |
| Violent History | 0, 1, 2, 3, 4, 5, 6, 7. BRAVO risk item. Higher numbers indicate more severe and more recent violence. |
| Time Since Last Misconduct Incident | 0, 1, 2, 3. PATTERN risk item. Higher numbers indicate more recent misconduct. |
| Time Since Last Serious Misconduct Incident | 0, 1, 2, 3. PATTERN risk item. Higher numbers indicate more recent serious misconduct. |
| Walsh Sex Offender | Dummy code. Flags both current and prior sex offenses. |
| Violent Current Offense | Dummy code from PATTERN risk item. |
| Sex | Dummy code for female. |
| Age | Set of dummy codes with 10-year categories, with 39 or less as reference category and 80+ as oldest category. Coding was adjusted and simplified for matching according to the age-recidivism relationship in each sample. |
| Sentence Length | Months, capped at 600 and log-transformed for positive skew. |
| RRC Assignment | Dummy code. Indicates prior stay in Residential Re-entry Center, for home confinement dataset only. |
| Homeless | Dummy code. Indicates no valid address in the management system. Record may be outdated if circumstances change. |
| Smoking History | Dummy code. From Health Services Department (HSD) records. |
| Diabetes | Dummy code. From HSD records. |
| Hypertension | Dummy code. From HSD records. |
| Cancer | Dummy code. From HSD records. |
| Weight | Set of dummy codes for underweight, overweight, obese, and morbidly obese, with normal as reference category. From HSD records. |
| Other Health Problems | Dummy code. Combined from multiple HSD records. A diverse set of statistically rare conditions.[8] |
| Guidance Date | Dummy code for whether the home confinement start date (for home confinement dataset) or release date (for post-release dataset) was after the April 2021 change to the CARES eligibility criteria. |

---

[7] Using other management records, one can reconstruct what the PATTERN scores *should* be in historical FBOP datasets, and this study did so in order to include some specific PATTERN risk items in the matching process. However, the actual total PATTERN score is what is used for risk level assignments and CARES eligibility decisions, and the actual PATTERN score was not constructed without error in the early years when it was calculated by hand. One cannot re-create the actual total PATTERN score accurately enough for a regression discontinuity.

[8] Includes HIV, emphysema, cirrhosis, sickle cell anemia, thalassemia, chronic kidney disease, solid organ transplant, cystic fibrosis, dementia, cerebrovascular dx, dialysis, cardiomyopathy, and heart failure.

For PSM, the candidate matching variables were selected to represent the eligibility criteria in the guidance. These matching variables are listed in Table 1. All matching variables were measured at the time of the home confinement date for the home confinement dataset or at the time of release for the post-release dataset. If the variable originated from PATTERN or the security classification tool, then it was measured at the time of the last classification tool assessment before the home confinement or release date, which could be up to a year earlier. To account for changes in the eligibility criteria, this study also included candidate interactions for matching: between guidance date and PATTERN Low-risk status (eligible after April 2021 but not before), between guidance date and current violent offense status (ineligible after April 2021, ambiguous eligibility before then), and between guidance date and time since last misconduct incident (recent minor misconduct may be eligible after April 2021).

## Pre-Release Matching

Figure 2 shows how many cases had to be cut for missing data or during matching. Missing data primarily concerned variables that related to the security classification tool and PATTERN. To have data for both, the last classification tool score before home confinement needed to be a re-classification, which is typically completed 7 months after FBOP entry. Missing individuals were not re-classified before release and generally had very short sentences. As such, this study's results only concern those who spent longer than a few months in a FBOP correctional facility.

Candidate matching variables were included in a Cox proportional hazard model predicting recidivism and then CARES assignment, removing any variables that did not independently, significantly predict both outcomes. Initial matching attempts found imbalances that were corrected with additional interactions that involved the imbalanced variables. Ultimately, the pre-release dataset was matched on guidance date, PATTERN risk level (and the interaction between Low PATTERN risk and guidance date), Violent History, Violent Current Offense (and its interaction with guidance date), Time Since Last Serious Misconduct, Walsh Sex Offender, sex, sentence length, homelessness, Residential Reentry Center (RRC) history (and its interaction with sentence length), age (with 18 to 49 as the reference category), smoking history, diabetes, hypertension, obesity, morbid obesity, other health problems, and security level (with its two-way interactions with guidance date, Violent History, Walsh Sex Offender, and RRC history).

CARES assignment was predicted very strongly, where Area Under Curve = 0.933. Individuals were greedily matched on log propensity scores with a caliper of 0.1. There were 12,066 individuals with a CARES assignment, of whom all were in the region of common support, and 26,992 persons without a CARES assignment, of whom all but 36 (0.1%) were in the region of common support. The remaining individuals were matched into just 4,511 pairs. There were no significant post-matching imbalances; the greatest difference was in sentence length ($t$ = -1.71, standardized difference = 0.036) which was not significantly different between the two groups.



Figure 2. Number of Individuals in sample

Legend: ■ With CARES ■ Without CARES

| | | With CARES | Without CARES |
|---|---|---|---|
| Home Confinement Dataset | Full Sample | 12181 | 29493 |
| | After Listwise Deletion of Missing Data | 12066 | 26992 |
| | Common Support for Matching | 12066 | 26956 |
| | After Matching | 4511 | 4511 |
| Post-Release Dataset, All Recidivism | Full Sample | 8710 | 89475 |
| | After Listwise Deletion of Missing Data | 6310 | 57378 |
| | Common Support for Matching | 6310 | 56192 |
| | After Matching | 5805 | 5805 |
| Post-Release Dataset, Violent Recidivism | After Listwise Deletion of Missing Data | 6355 | 58108 |
| | Common Support for Matching | 6355 | 50192 |
| | After Matching | 5770 | 5770 |

## Post-Release Matching

In the post-release sample, candidate matching variables were included in a logistic regression predicting 1-year recidivism and then CARES assignment, removing any variables that did not independently, significantly predict both outcomes. Unlike with the pre-release sample, no additional interactions were needed to achieve balance. Ultimately, the post-release dataset was matched on guidance date, PATTERN risk level (and the interaction between Low PATTERN risk and guidance date), security level, Violent History, Violent Current Offense (and its interaction with guidance date), Time Since Last Misconduct, Walsh Sex Offender, sentence length, homelessness, age (but only as "less than or greater than 50"), smoking history, diabetes, overweight, and morbid obesity.

Recidivism and CARES assignment were both predicted very strongly, where Area Under Curve = 0.787 and 0.900 for the two models, respectively. As with the other dataset, cases were greedily matched on the log propensity score with a caliper of 0.1. Post-match balancing was appropriate; the largest difference was on overweight status ($t = 1.80$, standardized difference = .033), which was not significantly different between cases with or without a CARES assignment.

Since the first step of the propensity-matching process involved predicting the outcome measure, this study had to repeat the matching process for the violent re-arrest outcome on the post-release dataset. This comparison selected a different set of variables compared to all recidivism, where it excluded all of the health variables, but included sex as well as a number of extra interactions that were needed to achieve balance.[9] There were no significant post-matching imbalances; the largest difference was in sentence length ($t = -1.79$, standardized difference = .033).

---

[9] Included two-way interactions between security level and each of: PATTERN medium risk, PATTERN high risk, guidance date, Violent History, and Walsh Sex Offender. Also included two-way interactions between sentence length and each of: PATTERN Low risk, guidance date, Walsh Sex Offender, Current Violent Offense, and Age.

## Analysis

For the matched pre-release dataset, the recidivism window is inconsistent from one individual to the next, so this study used a Cox Proportional Hazard Model instead of the usual logistic regression model, accounting for whether and *when* the individual recidivated. Cox Proportional Hazards models factor time out of the effect calculation. The matching process controls for all other factors, so the analysis used the CARES assignment as the only predictor of recidivism, which did not significantly impact the risk of recidivism pre-release ($\chi^2$ = 2.27, $p$ = .131, Hazard Ratio = 1.266) compared to other persons in home confinement. The recidivism or failure rates were 4.2% for persons with a CARES assignment and 1.3% for persons without. This gap would initially appear to be a notable difference, but with 9,022 persons and just 249 recidivists to predict, statistical power is rather low to conclude the difference is any more than a chance occurrence.

In the matched post-release dataset, the analysis utilized CARES assignment as the sole predictor of 1-year recidivism, but with a logistic regression model instead of a Cox model. Persons with a CARES assignment recidivated significantly less than comparable persons who did not receive a CARES assignment ($\chi^2$ = 12.23, $p$ = .0005, Odds Ratio = 0.724). Those with a CARES assignment had a 3.7% recidivism rate as compared to 5.0% for matching those without one.[10]

This study repeated the same test with violent recidivism, using a slightly different matched dataset. Individuals with a CARES assignment violently recidivated marginally significantly less than comparable persons who did not receive a CARES assignment ($\chi^2$ = 3.53, $p$ = .0602, Odds Ratio = 0.710). The violent recidivism rates were 0.9% for persons with a CARES assignment and 1.3% for those without one. With a marginally significant effect, the results suggest a possible reduction in violent recidivism but fall short of the usual scientific standards for significance.

---

[10] Cases were not matched based on time in home confinement for the post-release sample and did not require the control group to have spent time in home confinement. That was a necessary requirement for the control group in the pre-release sample. If one does match on home confinement in the post-release sample, this study found no effect of CARES assignment on recidivism.

EXHIBIT B



**FOR IMMEDIATE RELEASE**
March 29, 2024

Contact: Office of Public Affairs
202-514-6551

### CARES Act Shows Promise in Reducing Recidivism,
### Reinforcing the Benefits of Reduced Incarceration

**WASHINGTON, D.C.:** The Federal Bureau of Prisons' Office of Research and Evaluation, under the U.S. Department of Justice, has released the results of a comprehensive study on the impact of the CARES Act on home confinement. The CARES Act, enacted during the COVID-19 pandemic, allowed vulnerable individuals in federal prison to serve their sentences in home confinement earlier and for longer periods.

The study reveals that the CARES Act has had a statistically significant impact on recidivism rates. The Act, enacted during the COVID-19 pandemic, allowed vulnerable individuals in federal prison to serve their sentences in home confinement earlier and for longer periods.

Key findings include:

- **No Increase in Recidivism**: Individuals with a CARES home confinement placement showed no higher rates of recidivism while in home confinement compared to others with similar characteristics. This suggests that early and extended home confinement did not compromise public safety.
- **Reduced Post-Release Recidivism**: Post-release, individuals with a CARES assignment showed a lower recidivism rate of 3.7% compared to 5.0% for those without a CARES assignment. This indicates that reduced time spent in traditional incarceration contributed to lower recidivism rates.
- **Possible Reduction in Violent Recidivism**: A marginally significant effect suggests a possible reduction in violent recidivism for individuals with a CARES assignment. This suggests that reduced time spent in traditional incarceration contributed to a decrease in violent offenses.

These findings suggest that the CARES Act's provision for early and extended home confinement did not negatively impact recidivism rates. In fact, it may have contributed to a reduction in post-release recidivism, offering a promising direction for justice-involved stakeholders seeking effective strategies to reduce incarceration and its associated costs, while also promoting public safety and successful reintegration into society.

FBOP Director Colette S. Peters commented on the findings, "*This study reinforces my belief, shaped by decades of experience in corrections, that alternatives to mass incarceration are the most effective approach. The findings that individuals with a CARES assignment recidivated no more or less than comparable people in home confinement, and even less often post-release, are encouraging. This study suggests that reducing incarceration for appropriate people through measures like early and extended home confinement does not compromise public safety and in fact, suggests it may contribute to successful reintegration into society.*"

The study was initiated as part of FBOP's commitment to advancing the science and practice of corrections and ensuring that data and research inform correctional policies and practices. It also responds to the recommendations of FBOP's external stakeholders, which have called for more research and the development of alternatives to mass incarceration. This study serves as a testament to the benefits of innovative, compassionate approaches to criminal justice.

For a more detailed understanding of the study and its findings, we invite you to visit the Federal Bureau of Prisons' official website at bop.gov where you will navigate to the "Research and Reports" page within the "Resources" tab. Here, you can access the full report and delve into the comprehensive analysis that underscores these significant findings. We encourage all interested parties to review the results of the study to gain a deeper insight into the impact of the CARES Act on recidivism rates and the potential benefits of reduced incarceration.

###

*About the Federal Bureau of Prisons*
*FBOP is a United States Federal Law Enforcement agency within the U.S. Department of Justice. FBOP is comprised of corrections professionals who foster a humane and secure environment and ensure public safety by preparing individuals for successful reentry into our communities. For more information on the FBOP, you may visit our public website here at* bop.gov*.*

*About the Office of Research and Evaluation*
*ORE is the research, development, and evaluation branch of the FBOP. ORE is dedicated to improving knowledge and understanding within the FBOP of policies and practices through science. It generates objective data to inform the decision-making of employees and external agencies to foster continuous learning and improvement within the FBOP. More information about ORE, can be found on the* ORE Resource Page*.*

EXHIBIT C

| Begin Date: | 01/01/2024 | | End Date: | 03/11/2024 |
| Reg #: | 28047-479 | | Inmate Name: | HAMILTON, YOLANDA |

| **Date** | **Time** | **Treatment** | **Provider** | **Status** |
| 03/01/2024 | 14:30 CRW | Physical Therapy | Stablein, M. PT/DPT | Completed |

Treatment #1
Patient precautions: none currently
Subjective:
Patient seen in camp medical services for follow up treatment.  The patient reports she is still having some pain in both her right shoulder and right knee.  The patient reports she went out for an injection into her lower back today which required her to not use over the counter pain medication for the past week, so she has been suffering.  The patient reports that she has been trying to perform her HEP when her pain level is tolerable.

Objective:
Therapeutic exercise x 30 min
Shoulder AAROM with cane: flexion, abduction, extension, external rotation
Standing hip extension, 2 x 10
Standing hip abduction, 2 x 10
Seated tibialis raise, 2 x 10
Seated calf raise, 2 x 10

Assessment:
60-year-old presents with complaints of right shoulder pain and right knee pain secondary to a fall in January 2024.  Patient presents with positive special testing for both a lesion in the rotator cuff and the meniscus.  Instructed the patient to take it easy when trying to increase her activity level but encouraged her to at least do some light ROM on the days she is not feeling her best.  Discussed with the patient that her R shoulder/scapular imaging came back negative for fracture.  Patient will continue to benefit from skilled PT to address biomechanical deficits and established functional goals.  Follow up per POC as schedule permits.

Plan for next visit: Review HEP, progress with shoulder ROM, possibly shoulder isometrics, LE strengthening. Check MRI Status.
HEP: AAROM with dowel (flexion, extension, ER, abduction), standing hip extension, standing hip abduction, standing tibialis raises, standing calf raise
  **Orig Entered:**  03/01/2024 16:44 EST   Stablein, M. PT/DPT

**Total:**  1

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | HAMILTON, YOLANDA | | | Reg #: | 28047-479 |
| Date of Birth: | 06/11/1963 | Sex: | F    Race: BLACK | Facility: | CRW |
| Note Date: | 03/06/2024 11:18 | Provider: | Fisher, Catherine | Unit: | C03 |

Admin Note - Report Review encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**       Provider:   Fisher, Catherine (MOUD) NP-C
MRI of right shoulder pending scheduling.

Review of X-Rays:
Register#: 28047-479 Age: 60
Date: 02/21/24 14:43 Status: OP
Slicecount: 6
History: General Radiology - Scapula - General [Right]- Right Shoulder & right scapular pain General
Radiology - Shoulder - 3+ view w/Axillary/Neer [Right] General Radiology - Shoulder - AC Joints- General
[Right]
Priors:
Exams: XR RIGHT SCAPULA, XR RIGHT AC JOINT, XR RIGHT SHOULDER, 2+ views
Referring Phy: Fisher, Catherine (MOUD) NP-C
Ordering Phy: Fisher, Catherine (MOUD) NP-C
Ordering Phy #:817-782-4000
Accession Numbers: 1.2.840.113619.2.242.4.2147483647.1708543753.382266

Final Report
Exam: XR RIGHT SCAPULA
INDICATION: see above
COMPARISON: none
TECHNIQUE: 3 views right scapula obtained.
FINDINGS:
No fracture or malalignment.
Joint spaces are maintained.
Articular surfaces are smooth.
Bone mineralization is within normal limits. No bony exostosis or lytic or blastic lesions.
Soft tissues are unremarkable by radiograph exam.
IMPRESSION:
No fracture or malalignment.
Unremarkable right scapula radiographic exam.
Exam: XR RIGHT AC JOINT
INDICATION: see above
TECHNIQUE: AP with and without weightbearing views of the right acromioclavicular joint are
obtained.
COMPARISON: none
FINDINGS:
No fracture or malalignment. No subluxation with weightbearing.
Joint spaces are maintained.
Articular surfaces appear smooth.
Soft tissues are unremarkable by radiographic exam.
IMPRESSION:
No fracture or malalignment. No subluxation with weightbearing.
Unremarkable exam. No arthritic changes.

Exam: XR RIGHT SHOULDER
INDICATION: see above
TECHNIQUE: 3 views of the right shoulder are obtained.

YLH000503

COMPARISON: none
FINDINGS:
No fracture or malalignment.
Joint spaces are maintained.
Articular surfaces appear smooth.
Soft tissues are unremarkable. No radiographic evidence for calcific tendinosis.
IMPRESSION:
No fracture or malalignment.
Unremarkable exam. No osseous lesion or arthritic changes.
Radiologist:
Farhad Khorashadi, MD
Study ready at 14:43 and initial results transmitted at 16:0

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:**    No

Completed by Fisher, Catherine (MOUD) NP-C on 03/06/2024 11:19

YLH000504

| | | | |
|---|---|---|---|
| Inmate Name: HAMILTON, YOLANDA | | Reg #: | 28047-479 |
| Date of Birth: 06/11/1963 | Sex: F  Race: BLACK | Facility: | CRW |
| Encounter Date: 02/16/2024 12:45 | Provider: Stablein, M. PT/DPT | Unit: | C03 |

Physical Therapy - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1        Provider:  Stablein, M. PT/DPT

Chief Complaint:    Muscle/Joint Ache

Subjective:        Subjective
Physical therapy consulted by xx. Consult: "S: 68 yr old BF presents with c/o "Right shoulder
pain & right knee pain, both new since falling a couple of weeks ago". AIC was seen on
1/10/24 for the above fall on 1/10/24.
I am concerned about a possible rotator and or Meniscus tear. Please may I obtain an MRI for
both".
1/17/24: AIC received a Right Knee X-Ray & Right-Hand X-Ray.  Both negative for fracture."

Patient reports falling on her R hand and R knee about 3-4 weeks ago and is worried she may
have injured her shoulder and knee in the process.  The patient reports that she has to use
her L arm to assist her R arm in daily tasks and anything overhead.  The patient states that
she had previous physical therapy for her back around 7-8 months ago and that her back is
still giving her problems as well.  The patient reports she is taking 800 mg of ibuprofen for the
pain and it seems to provide some relief.  The patient states she is having trouble sleeping at
night because of the pain.  Patient states she is right handed.

Pain level: 6/10 current, 9/10 worst, 5/10 best
Pain location: R knee and R shoulder
Pain description: The patient describes the pain as a burning, dull/ache.
Aggravating: overhead lifting, prolonged standing
Alleviating: rest
Irritability: High
Stage: Subacute
Patient's current functional limitations include any activities overhead.

Patient goals: "I want to make sure that I did not do any permanent damage with the fall"

PMH: LBP, radiculopathy, GERD, HTN

The patient denies any night pain, unexplained wt loss, bowel/bladder changes, drop attacks,
dizziness, diplopia, dysphagia, dysarthria, nystagmus, B numbness/tingling, cranial nerve
signs.
Patient precautions: none currently
Work detail: none

Pain:            Not Applicable

---

**OBJECTIVE:**

**Exam Comments**

Objective
Observation: Patient presents with anterior pelvic tilt, forward head and rounded shoulders in standing.
Gait: Patient ambulated in hallway xx feet without an assistive device. Symmetrical gait with good pace.

ROM: WNL unless otherwise noted. ! denotes pain.

YLH000512

Shoulder Flexion AROM 70! PROM 95!
Shoulder Extension AROM 25! PROM 30!
Shoulder Abduction AROM 55! PROM 90!
Shoulder Adduction AROM 30!
Shoulder Internal Rotation AROM R sacral boarder
Shoulder External Rotation AROM 60 PROM 60
Lower extremity WFL

Functional Strength: Patient able to perform bed mobility and transfers independently.
Strength: 5/5 throughout unless otherwise noted. ! denotes pain.
Unable to properly assess shoulder strength because of pain on the right
Lower extremity strength was WFL with some pain the in right knee with knee extension MMT

Sensation: intact to light touch bilateral and LE
Reflexes: not assessed

Palpation: pain with palpation to RTC and medial joint line of the knee
Mobility: some decreased mobility in R shoulder due to muscle guarding

Special Tests: Right shoulder and knee
Pos: drop arm test, ER lag test, Infraspinatus test (weakness in ER), Apleys compression, Thessalys' (popping and pain)
Neg: Knee ligamentous testing

Outcome measures: LEFS 17/80; SPADI 98/130

Today's Treatment: Patient educated on findings of PT evaluation, role of PT, activity modification, and plan of care. Patient instructed on exercise program, including: AAROM with dowel (flexion, extension, ER, abduction), standing hip extension, standing hip abduction, standing tibialis raises, standing calf raises. Patient verbalized understanding and expressed agreement with plan.

**Comments**

Informed Consent: Patient signed rehabilitation services consent form, acknowledging that they will take responsibility for their healthcare. Patient agrees to participate in therapy, to include home exercise program, safety precautions, and arriving on time for scheduled callouts. Patient acknowledges that if they no-show for two callouts, physical therapy will be discontinued and patient will require new referral to be seen by rehabilitation services.

**ASSESSMENT:**

Pain-Knee

Assessment
60-year-old presents with complaints of right shoulder pain and right knee pain secondary to a fall approximately 1 month ago. Patient presents with positive special testing for both a lesion in the rotator cuff and the meniscus. Patient's prognosis is fair pending imaging results and ortho plan of care. Patient will benefit from skilled physical therapy services to make sure they are not losing range of motion or function while waiting for imaging results. The patient will also benefit from symptom modification efforts through therapy. Noted the patient has MRI consult placed for both there R shoulder and R knee.

**PLAN:**

Schedule:

| **Activity** | **Date Scheduled** | **Scheduled Provider** |
| Follow-up | 03/01/2024 12:45 | Phys Therapist 05 |

Right shoulder / Right knee - fall - MRI Pending

**Disposition:**

Will Be Placed on Callout

**Other:**

Plan

YLH000513

Patient to be seen 1 time per week for 8-10 visits. Re-assess in 45-60 days.

Goals:
1. Independent and compliant with HEP within 2 visits
2. Decrease SPADI to < 88 within 10 visits
3. Increase LEFS to > 26 within 10 visits

Plan for next visit: Review HEP, progress with shoulder ROM, possibly shoulder isometrics, LE strengthening.  Check MRI Status.

HEP: AAROM with dowel (flexion, extension, ER, abduction), standing hip extension, standing hip abduction, standing tibialis raises, standing calf raise

Treatment notes will be found under flowsheets.  Clinical encounters will be used for re-assessment, change in patient status and discharge.

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 02/16/2024 | Counseling | Exercise | Stablein, M. | Verbalizes Understanding |
| 02/16/2024 | Counseling | Plan of Care | Stablein, M. | Verbalizes Understanding |
| 02/16/2024 | Counseling | Exercise | Stablein, M. | Returns Demonstration |

**Copay Required:** No          **Cosign Required:**  Yes
**Telephone/Verbal Order:**   No

Completed by Stablein, M. PT/DPT on 02/16/2024 15:35

Requested to be cosigned by  Robinson-Brown, La Tonjia Chelese (MOUD) MD.

Cosign documentation will be displayed on the following page.

Requested to be reviewed by  Fisher, Catherine (MOUD) NP-C.

Review documentation will be displayed on the following page.

YLH000514

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | HAMILTON, YOLANDA | | | Reg #: | 28047-479 |
| Date of Birth: | 06/11/1963 | Sex: F | Race: BLACK | Facility: | CRW |
| Encounter Date: | 02/07/2024 07:22 | Provider: | Fisher, Catherine (MOUD) | Unit: | C03 |

Mid Level Provider - Sick Call Note encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT **1**     Provider:   Fisher, Catherine (MOUD) NP-C

Chief Complaint:   Pain

Subjective:   S: 68 yr old BF presents with c/o "Right shoulder pain & right knee pain, both new since falling a couple of weeks ago". AIC was seen on 1/10/24 for the above fall on 1/10/24
I am concerned about a possible rotator and or Meniscus tear. Please may I obtain an MRI for both".

1/17/24: AIC received a Right Knee X-Ray & Right-Hand X-Ray. Both negative for fracture.

**Pain:**   Yes

**Pain Assessment**

| | |
|---|---|
| Date: | 02/07/2024 07:26 |
| Location: | Multiple Locations |
| Quality of Pain: | Aching |
| Pain Scale: | 7 |
| Intervention: | OTC meds |
| Trauma Date/Year: | |
| Injury: | |
| Mechanism: | |
| Onset: | 1-2 Weeks |
| Duration: | 1-2 Weeks |
| Exacerbating Factors: | None |
| Relieving Factors: | None |
| Reason Not Done: | |
| Comments: | |

**ROS:**

**General**

**Constitutional Symptoms**

No: Anorexia, Chills, Easily Tired, Fatigue

**OBJECTIVE:**

**Temperature:**

| Date | Time | | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|---|
| 02/07/2024 | 06:40 | CRW | 96.3 | 35.7 | | Acosta, A. Medical Assistant |

**Pulse:**

| Date | Time | | Rate Per Minute | Location | | Rhythm | Provider |
|---|---|---|---|---|---|---|---|
| 02/07/2024 | 06:40 | CRW | 78 | | | | Acosta, A. Medical Assistant |

**Respirations:**

YLH000518

| **Date** | **Time** | **Rate Per Minute** | **Provider** |
| --- | --- | --- | --- |
| 02/07/2024 | 06:40 CRW | 16 | Acosta, A. Medical Assistant |

**Blood Pressure:**

| **Date** | **Time** | **Value** | **Location** | **Position** | **Cuff Size** | **Provider** |
| --- | --- | --- | --- | --- | --- | --- |
| 02/07/2024 | 06:40 CRW | 124/61 | | | | Acosta, A. Medical Assistant |

**SaO2:**

| **Date** | **Time** | **Value(%)** | **Air** | **Provider** |
| --- | --- | --- | --- | --- |
| 02/07/2024 | 06:40 CRW | 97 | | Acosta, A. Medical Assistant |

**Exam:**

**General**

**Affect**

Yes: Pleasant, Cooperative

No: Irritable, Agitated

**Appearance**

Yes: Appears Well

No: Appears Distressed

**Pulmonary**

**Auscultation**

Yes: Clear to Auscultation

**Cardiovascular**

**Auscultation**

Yes: Normal S1 and S2

**Abdomen**

**Auscultation**

Yes: Normo-Active Bowel Sounds

**Palpation**

Yes: Within Normal Limits, Soft

No: Guarding, Rigidity

**Exam Comments**

Right Shoulder: Posterior aspect. Tenderness noted medial edge of scapula & with ROM.
Right Knee: Generalized tenderness noted on exam & with ROM. Reports pain is more intense with walking and climbing.

**ASSESSMENT:**

Pain in unspecified joint, M2550 - Current - *Right Knee*

Pain in unspecified joint, M2550 - Current - *Right Shoulder*

**PLAN:**

**New Radiology Request Orders:**

| **Details** | **Frequency** | **End Date** | **Due Date** | **Priority** |
| --- | --- | --- | --- | --- |
| General Radiology-Scapula-General [Right], General Radiology-Shoulder-3+ view w/Axillary/Neer [Right], General Radiology-Shoulder-AC Joints - General [Right] | One Time | | 02/14/2024 | Routine |

YLH000519

Specific reason(s) for request (Complaints and findings):

Right Shoulder & right scapular pain

## New Consultation Requests:

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Radiology | 03/28/2024 | 03/28/2024 | Routine | No | |

Subtype:

on site MRI

Reason for Request:

MRI: Right Shoulder without & with contrast
MRI: Right Knee without & with contrast
R/O soft tissue injury.

S: 68 yr old BF presents with c/o "Right shoulder pain & right knee pain, both new since falling a couple of weeks ago". AIC was seen on 1/10/24 for the above fall on 1/10/24
AIC is concerned for a soft tissue injury.

1/17/24: AIC received a Right Knee X-Ray & Right-Hand X-Ray. Both negative for fracture.

Provisional Diagnosis:

Right Shoulder Pain
Right Knee Pain

| | | | | | |
|---|---|---|---|---|---|
| Physical Therapy | 02/21/2024 | 02/21/2024 | Routine | No | |

Subtype:

Physical Therapy Staff

Reason for Request:

S: 68 yr old BF presents with c/o "Right shoulder pain & right knee pain, both new since falling a couple of weeks ago". AIC was seen on 1/10/24 for the above fall on 1/10/24.
I am concerned about a possible rotator and or Meniscus tear. Please may I obtain an MRI for both".
1/17/24: AIC received a Right Knee X-Ray & Right-Hand X-Ray. Both negative for fracture.

Provisional Diagnosis:

Right Shoulder & Right Knee Pain
Please evaluate for PT needs/intervention.

## Disposition:

Follow-up at Sick Call as Needed
Follow-up at Chronic Care Clinic as Needed

## Other:

Take OTC meds as directed.
Heat or ice to areas of pain.
PT Evaluation & MRIs pending.

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 02/07/2024 | Counseling | Plan of Care | Fisher, Catherine | Verbalizes Understanding |

**Copay Required:** Yes     **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Fisher, Catherine (MOUD) NP-C on 02/07/2024 07:43

YLH000520